UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
EMMANUEL OKORO,                     :
                        Plaintiff,  :
                                    :      07 Civ. 165 (DLC)
            -v-                     :
                                    :      OPINION & ORDER
MARRIOTT INTERNATIONAL, INC. and THE :
RITZ CARLTON HOTEL,                 :
                        Defendants. :
                                    :
------------------------------------ X

Appearances

For Plaintiff:
Matthew J. Blit
Levine & Blit, PLLC
Empire State Building
350 Fifth Avenue, Suite 3601
New York, NY 10118

For Defendant The Ritz Carlton Hotel:
Brian S. Cousin
Eric B. Sigda
Lauren R. Tanen
Greenberg Traurig, LLP
200 Park Avenue
MetLife Building
New York, NY 10166


DENISE COTE, District Judge:

     Defendant The Ritz-Carlton Hotel Company (the "Ritz")

has moved for summary judgment on all claims brought

against it in this employment discrimination action by

plaintiff Emmanuel Okoro.  Okoro had previously worked at

the New York Marriott Marquis (the "Marquis"), from

December 1999 until December 2003, when he was fired.  The

- 1 -

Ritz hired Okoro in July 2004, and fired him in December
2004.  Roughly three years later, in January 2008, an
arbitrator rejected Okoro's claim that the Marquis had
fired him in 2003 without just cause.  In this lawsuit,
Okoro challenges his firing by the Ritz, alleging that in
firing him the Ritz (1) retaliated against him for
appealing his discharge from the Marquis, and (2)
discriminated against him based on his disability, which he
identifies as narcolepsy.  For the following reasons, the
Ritz's motion for summary judgment is granted.

BACKGROUND

     The following facts are undisputed or taken in the
light most favorable to the plaintiff, except where noted.
See Capobianco v. City of New York, 422 F.3d 47, 50 (2d
Cir. 2005).

Employment by the Marquis:  1999 to 2003

     The Marquis hired Okoro in December 1999 for a doorman
position, and management reassigned him in 2003 to work as
a "bar back."  While at the Marquis, Okoro had an episode
of cataplexy, a temporary paralysis or loss of muscle
control while awake.  Cataplexy may be a symptom of
narcolepsy.  He also suffered from muscle fatigue and

muscle spasms.  His manager, Martin Mariano ("Mariano"), once encountered Okoro in a trance-like state.  Okoro contends that he notified the Marquis of "my disorder," but does not explain what he described his disorder to be or to whom he spoke at the Marquis.

On December 19, 2003, the Marquis fired Okoro for sleeping on duty.  Okoro appealed unsuccessfully to the Director of Food and Beverage and then to a Peer Review Panel.  In August 2006, he filed an arbitration claim, which is described below.


Okoro's Medical Care: 2003 to February 2004[1]

Following a medical examination in April 2003, Dr. Latonia Ward, Okoro's personal physician, noted that Okoro had once suffered from muscle fatigue, muscle spasms, and extreme exhaustion, which she noted could be caused by his twenty-one-hour workday or "something else."[2]  She found that Okoro's condition had not persisted, and described him as "improved" and "in good health," which she explained meant that "there [was] nothing baseline wrong" with Okoro.

_____

[1] This description of Okoro's medical care is taken from his doctor's testimony of October 29, 2007 and the January 16, 2008 decision of the arbitrator in Okoro's arbitration with the Marquis.

[2] Okoro reported that he began work at 6:00 a.m. and finished at 3:00 a.m. the following morning.

She did not refer him for sleep tests.

During a subsequent examination, on January 22, 2004,
Dr. Ward again found Okoro to be in good health, noting
that he was paying more attention to maintaining a healthy
diet and taking multivitamins.  She also noted that he had
had an episode of cataplexy, although he did not display
any other symptoms of narcolepsy.  Dr. Ward saw Okoro one
month later, in February 2004, for a follow-up examination,
at which Okoro reported that he had "improved his diet, is
getting more rest," and "feels better."

At no point did Dr. Ward recommend that Okoro request
any accommodations from his employer or prescribe any
medication, aside from the suggestion that Okoro take
multivitamins.  During his arbitration against the Marquis,
Okoro conceded that he had never been diagnosed with
narcolepsy and had never gone for a sleep test or been
diagnosed at a sleep disorder center.


Employment with the Ritz: July 2004 to December 2004

Roughly half a year after being fired by the Marquis,
in July 2004, Okoro applied for a position at the Ritz.
The employment application for the Ritz included questions
about employment experience, including an inquiry as to
whether the applicant had ever applied for employment with

either "The Ritz-Carlton Hotel Company" or "Marriott
International or any subsidiary of Marriott." Realizing
that he was required to disclose his prior employment with
the Marquis, Okoro asked to speak with Deborah Croce
("Croce") from Human Resources. He contends that he "fully
explained to her my employment history at Marquis,
including my termination and the circumstances thereto, my
medical condition, and my pending appeal against the
Marriott." He told Croce that he had been caught at the
Marquis "with my eyes closed," that he had been sleeping
because of his "disorder," and that he was then in
litigation with Marquis over his firing. For her part,
Croce admits that Okoro told her that the Marquis had fired
him and that he had a pending case with it. Croce directed
Okoro "to complete" the employment application and added,
"let's see what happens".

    Okoro proceeded to fill out the application, but left
blank that portion of the application form which required
him to record the "Reason for Leaving" the Marquis. Okoro
completed this question for other prior jobs that he listed
on the form. The application states that a "material
omission in my application and during interviews is grounds
for a refusal to hire, or discharge in the event of
employment". Okoro asserts that he believed that he could

omit the reasons for leaving the Marquis because he had
described his situation orally to Croce.

Croce reviewed the application, assured Okoro that
"everything was fine" and hired him as a temporary
employee.[3]  He was assigned to the housekeeping department
for a 90-day probationary period.  He was offered and
accepted a permanent position in November 2004.

Within weeks of becoming a permanent employee, Okoro
encountered his former manager from the Marquis, Mariano,
who now worked at the Ritz.  Mariano told Richard Evanich,
the hotel's general manager, that Okoro had been fired by
the Marquis.  Evanich then spoke with Croce.  He told her
that Okoro had been fired by the Marquis, and questioned
why Okoro was working at the Ritz.

On December 8, after reviewing Okoro's employment
application, Croce consulted with in-house counsel and
Evanich and decided to fire Okoro.  Meeting shortly
thereafter with Okoro, his union's business agent Steven
Miller, and union representatives Anthony Durceuil and
George Thurmond, Croce explained that Okoro was being fired
because he had not stated his reason for leaving the

---

[3] Croce denies that she reviewed the application.

Marquis on his employment application.[4]  Okoro asserts that
during this meeting (and during another shortly thereafter)
Croce admitted that he had fully disclosed orally at their
initial meeting the circumstances under which the Marquis
had fired him.

Croce offered Okoro the option of resigning with one
week's severance pay instead of being fired.  Miller met
separately with Okoro to discuss Croce's offer.  According
to Okoro, the union officials explained that Croce would be
fired for having hired Okoro unless she fired him now.[5]
They recommended that he agree to resign.  Miller has
testified that he explained Okoro's options to him,
including tendering his resignation with the hope although
no promise that Croce would help get him another job, or
challenging the termination by pursuing arbitration.  Okoro
agreed to resign based on his understanding that Croce
would soon thereafter help place him in a new job.

The parties also dispute what happened next.  Okoro
asserts that in December, he met with Croce, who dictated a
handwritten letter for him to sign.  The letter stated that

---

[4] The Ritz argues that it fired Okoro in part because it had
received complaints against him lodged by his co-workers.
Given the result reached here, it is unnecessary to discuss
this issue further.

[5] Miller denies telling Okoro that Croce would be
disciplined if he didn't agree to resign.

he was resigning from the Ritz with the understanding that he would be relocated to work at another property. Okoro has not offered a copy of this document with his opposition to this motion.

Defendants assert that Okoro met with Croce on January 7, 2005, and that he signed a typewritten release of all claims against the Ritz after Croce read it to him point-by-point. His union representative had been invited to attend the meeting, but did not and signed the release separately a few days later. Okoro denies signing the release, although he admits that the signature on the release "appears to be very similar" to his. According to Okoro, he first saw the release when a copy was produced during the discovery period in this litigation.[6]

Okoro sought an arbitration to challenge his firing. When his union did not commence one, he filed a charge against the union with the National Labor Relations Board ("NLRB"). The NLRB dismissed his charge because it found that he had entered into a binding settlement agreement in which the union withdrew his grievance in exchange for the Ritz converting the termination into a resignation and providing him with a severance payment.

---

[6] In his deposition Okoro testified that he did not remember signing the release.

<u>Arbitration with the Marquis</u>

Approximately a year and a half after losing his employment with the Ritz, that is, in August 2006, Okoro filed a demand for arbitration against the Marquis with the American Arbitration Association.[7]  Although the demand apparently claimed that the Marquis had fired him "without just cause," the arbitrator found that Okoro's employment was not covered by a collective bargaining agreement or any employment contract requiring just case for termination. Since Okoro had not asserted any violation of a statute or the common law, his rights as an at-will employee arose from the Marquis' Progressive Discipline Policy and its Guarantee of Fair Treatment Policy.  Applying those standards, and following hearings held in October and November 2007, the arbitrator rejected Okoro's challenge to the termination decision.

In a written opinion, the arbitrator determined that Okoro had been treated fairly following a series of written warnings given largely for absenteeism and tardiness.  The

---

[7] The record does not clearly establish what appeals Okoro pursued between the appeal to the Peer Review Panel, which rejected his claim in January 2004, and his arbitration demand, which he filed in August 2006.  Okoro asserts that "Beginning or about January 2004 and continuing for approximately three (3) years thereafter, the appeals process and/or arbitration proceeding was still pending."

opinion also found that the record did not support his attorney's claim in his closing statement that Okoro suffered from narcolepsy, or that any of the Marquis' actions were motivated by either that condition or a perception that Okoro suffered from that condition.[8]

The opinion referred to the fact that Okoro's physician had never diagnosed him with narcolepsy.  The arbitrator also noted that during the period of his employment, when Okoro was suspended for sleeping on the job, he did not refer to any medical condition; rather, Okoro had explained to his employer that he was exhausted or "wiped out" from working two jobs.  Following one of his suspensions, Okoro informed the Marquis that he had resigned from his second job and moved, and would "no longer have any problem getting plenty of rest."  Given that Okoro had referred to his work schedule and lack of sleep, and not narcolepsy or any other medical condition, as causes for his somnolence at work, the arbitrator found that his ailment was "volitional" rather than "medically driven."

---

[8] In its reply memorandum, the Ritz argues in passing and for the first time that the arbitrator's finding that Okoro was not disabled should be given collateral estoppel or res judicata effect.  Given that the Ritz did not raise this claim until its reply, it will not be further considered.

In the same month in which Okoro filed his arbitration claim, August 2006, Okoro filed this action in state court against the Ritz and Marriott International ("Marriott") (of which the Ritz is a subsidiary) alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), and New York State and City Human Rights Laws, N.Y. Exec. Law §296(1) et seq.; Administrative Code §8-107(1) et seq. ("NYSHRL" and "NYCHRL," respectively). Specifically, he alleges in his complaint that he developed narcolepsy in 2001 and it became so severe that he would fall asleep while working. When he requested a medical leave from the Marquis, it was denied. In December, the Marquis fired him for sleeping on the job, and Okoro appealed through his employer's appeals procedure. Okoro asserts that the Ritz later fired him "because he had pursued his appeal of his termination" by Marquis. His claims against the Ritz are that he was discharged "because of his disability and his protest of his discharge by" the Marquis.

In September 2006, Okoro and Marriott stipulated to discontinue the action as to Marriott. On January 9, 2007, the Ritz removed the action to federal court based on diversity and federal question jurisdiction.

On January 17, 2007, before any discovery had been conducted, the Ritz moved to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P., or in the alternative for summary judgment under Rule 56 on the ground that Okoro had released his claims against the Ritz in a settlement agreement. This Court denied the motion, reviewing it under Rule 56 and finding that material issues of fact existed regarding whether the waiver of rights in the release, if signed, was knowing and voluntary. Okoro v. Mariott Intern., Inc., 2007 WL 980429, at *2 (S.D.N.Y. Apr. 3, 2007). Having conducted discovery, the Ritz now seeks summary judgment on the entire complaint.[9] The only witness affidavit submitted by the parties with their motion papers is Okoro's. The parties otherwise rely on a few documentary exhibits and brief excerpts from depositions.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine

---

[9] Since the Ritz filed its motion for summary judgment on December 19, 2007, Okoro has been granted numerous extensions to file his opposition to the motion in light of the fact that his original counsel withdrew from the representation, he was proceeding pro se, and he then retained counsel once more just as he reached the final due date for his opposition. Okoro ultimately submitted his opposition on September 15, 2008, and the Ritz filed its reply on September 22, 2008.

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169.  That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A. Burden-Shifting Framework

Each of Okoro's claims is subject to the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1972).  Under <u>McDonnell Douglas</u>, once a plaintiff makes out a prima facie case of retaliation or discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. 411 U.S. at 802-03.  If the defendant produces evidence of such a reason, the plaintiff must point to evidence sufficient to permit a rational factfinder to conclude that the defendant's reason is merely a pretext for discrimination or retaliation.  <u>Id</u>. at 803-04.  See <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 721 (2d Cir. 2002) (applying the framework to a retaliation claim under the ADA); <u>Heyman v. Queens Vill. Comm. for Mental Health</u>, 198 F.3d 68, 72 (2d Cir. 1999) (applying the framework to ADA claims).  Claims under the NYCHRL and the NYSHRL are also analyzed under the <u>McDonnell-Douglas</u> burden-shifting analysis.  See <u>Weissman v. Dawn Joy Fashions, Inc.</u>, 214 F.3d 224, 234 (2d Cir. 2000) (applying ADA analysis to plaintiff's retaliation claim under both the NYHRL and NYCHRL); <u>Reeves v. Johnson Controls World Services, Inc.</u>,

140 F.3d 144, 156 n.9 (2d Cir. 1998) (noting that NYSHRL

claims are analyzed using McDonnell Douglas burden-

shifting).


B. Retaliation Claim

   Okoro's complaint asserts that the Ritz retaliated

against Okoro in 2004 because he appealed the 2003 decision

by the Marquis to fire him.[10]  The Ritz moves for summary

judgment on the retaliation claim on five separate grounds.

It argues first that Okoro cannot demonstrate a prima facie

claim because he cannot establish that his appeal

constituted protected activity or that a causal connection

exists between the appeal and the decision by the Ritz to

discharge Okoro.  It also contends that it has shown a non-

retaliatory reason for the discharge and that Okoro cannot

show that its proffered reason was a pretext for

retaliation.  Finally, it asserts that the fact that the

same person hired and fired Okoro prevents Okoro from

succeeding on his retaliation claim.  It is only necessary

---

[10] While the Ritz interprets this as a claim of retaliation
based on the arbitration that Okoro filed in 2006, the
arbitration is not mentioned in the complaint and could not
have precipitated the Ritz's decision to fire Okoro since
the firing preceded the filing of the arbitration claim.
Thus, the defendant's argument is more broadly construed as
one based on all of the stages of Okoro's appeal of the
Marquis termination decision.

to address two of these issues:  the failure to demonstrate protected activity and the same actor argument.

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  To survive a summary judgment motion on his retaliation claim, Okoro must first make the following prima facie showing of retaliation: that (1) he engaged in an activity protected by the ADA; (2) the Ritz was aware of this activity; (3) the Ritz took an adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.  Treglia, 313 F.3d at 719 (noting that the same standard applies under the ADA and Title VII).

Protected Activity

The Ritz argues that Okoro's appeals from the Marquis's decision to fire him are not protected activity because Okoro did not allege a violation of disability laws in those appeals.  Instead, he complained that this discharge was without just cause.

With respect to participation in a protected activity,
the plaintiff need not show that the conduct he opposed was
a violation of the ADA; rather, he need only "establish
that he possessed a good faith, reasonable belief that the
underlying challenged actions of the employer violated" the
ADA.  Id. (citation omitted).  The reasonableness of
plaintiff's belief that he has been a victim of
discrimination is assessed "in light of the totality of the
circumstances."  Galdieri-Ambrosini v. National Realty &
Development Corp., 136 F.3d 276, 292 (2d Cir. 1998).  To
constitute protected activity, however, a plaintiff's
complaint must be sufficiently pointed to be reasonably
understood as a complaint of discrimination.  In Galdieri-
Ambrosini, a gender discrimination case brought under Title
VII, the court rejected the plaintiff's retaliation claim
because she presented no evidence that her complaints to
her employer contained any allegations of gender
discrimination.  Id.  "[T]here was nothing in her protests
that could reasonably have led [the defendant] to
understand that [gender discrimination] was the nature of
her objections."  Id.

Okoro has failed to offer any evidence of the claims
that he presented during his appeals from the Marquis'
decision to fire him prior to the decision by the Ritz to

fire him.  The only evidence that he has offered about the
substance of the claims he pressed in his appeals is the
arbitrator's decision, rendered over two years after he
lost his job at the Ritz.  Even that decision does not
assist Okoro.  As of 2006, roughly three years after he was
fired by the Marquis, Okoro was still challenging that
decision on the ground that the Marquis did not have "just
cause" for its action.  The arbitrator rejected just cause
as the correct standard and further noted that Okoro was
not claiming that he was fired in violation of any statute,
which would presumably include the ADA and its state and
local counterparts.[11]  Okoro has failed, therefore, to
present prima facie evidence of retaliation.  He has not
shown that his appeals before he was fired by the Ritz
constituted protected activity.[12]

---

[11] Given that Okoro has not shown that he engaged in any
protected activity before he was fired by the Ritz, it is
unnecessary to address his contention that knowledge of
that activity by an employee of the Marquis may be
attributed to the Ritz.

[12] The parties dispute whether protected activity vis-à-vis
the Marquis can be the predicate for a retaliation claim
against the Ritz.  The Second Circuit has "permitted a
retaliation claim where the entity committing the
retaliation was different from the entity about whose
employment practices the plaintiff had complained."
McMenemy v. City of Rochester, 241 F.3d 279, 284 (2d Cir.
2001).

<u>Evidence of Discrimination:  Same Actor Inference</u>

Even if Okoro were able to carry his burden of showing
the existence of prima facie evidence of retaliation, his
claim of retaliation would have to be dismissed because he
has not presented sufficient evidence that he was fired
because of retaliation.  It is undisputed that the Ritz has
articulated a legitimate, non-retaliatory reason for firing
Okoro:  the fact that he had been fired from a previous
position at a hotel and did not disclose that fact on his
employment application in the space that demanded the
"Reason for Leaving."  The Ritz contends that Okoro has not
shown that any person involved with the decision to fire
him acted out of retaliation for discrimination claims made
during his appeals from the Marquis' termination of his
employment.  It notes, in particular, that Croce, who fired
him, had just months earlier hired him.

There are three Ritz employees whom Okoro has
identified as involved in the decision to fire him.  For
two of those employees, Mariano and Evanich, Okoro has
presented no evidence that they had any knowledge as of
July 2004 that Okoro had challenged the Marquis'
termination decision through an appeal process, much less
that they knew the substance of the claims made by Okoro in
those appeals.

As for Croce, Okoro has provided evidence that he told her when he applied for a job that he had "an appeal" pending against the Marquis. He asserts in conclusory form that he also explained to her his employment history at the Marquis, his "medical condition," and the "circumstances" of the termination of his employment. This is insufficient to constitute reasonable notice to Croce that Okoro's appeal from the termination of his employment relied on a complaint of discrimination due to a disability. But, even if this were deemed adequate notice, Okoro still confronts the difficulty posed by the fact that Croce permitted him to apply for employment at the Ritz following this conversation. Moreover, he has pointed to no evidence that between that time and the date he was fired, Croce learned anything more about the grounds on which he was appealing his firing by the Marquis. Thus, Okoro has failed to present evidence from which a jury could infer that Croce acted out of retaliation in firing Okoro. See Jetter v. Knothe Corp., 324 F.3d 73, 76 (2d Cir. 2003) (discussing "same actor" rationale). But see Feingold v. New York, 366 F.3d 138, 155 n.15 (2d Cir. 2004) ("We do not pass judgment on the extent to which this inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied").

C. Disability Discrimination Claim

     Okoro claims that the Ritz terminated his employment
on account of discrimination against him because of a
disability.  He asserts that he was disabled due to
narcolepsy, and that he was regarded by the Ritz as being
disabled.  The Ritz argues that Okoro has not introduced
any evidence that (1) he had a cognizable disability while
employed at the Ritz or (2) he did or said anything to give
the Ritz notice that he had a disability.  It relies again
on the "same actor" inference to remove any suggestion that
Croce fired Okoro based on any knowledge that he shared
with her when he applied for employment.

     The ADA prohibits discrimination against a "qualified
individual with a disability because of the disability" in
the "terms, conditions, and privileges of employment." 42
U.S.C. § 12112(a). In order to sustain his claim, Okoro
must offer evidence that: (1) the defendant is covered by
the ADA; (2) he suffers from or is regarded as suffering
from a disability within the meaning of the ADA; (3) he was
qualified to perform the essential functions of the job,
with or without reasonable accommodation; and (4) he
suffered an adverse employment action because of his

disability or perceived disability.  <u>Capobianco</u>, 422 F.3d
at 56.

The ADA definition of "disability" is "(A) a physical
or mental impairment that substantially limits one or more
of the major life activities of such individual; (B) a
record of such an impairment; or (C) being regarded as
having such an impairment." 42 U.S.C. § 12102(2);
<u>Capobianco</u>, 422 F.3d at 56.  Not every impairment is a
disability for the purposes of the ADA; the impairment must
both limit a major life activity and the limitation must
also be substantial.  <u>Capobianco</u>, 422 F.3d at 56.  For the
plaintiff to be "regarded as having such an impairment,"
the employer must do more than perceive the employee as
somehow disabled; the "employer must regard the employee as
disabled within the meaning of the ADA."  <u>Id</u>. at 57
(citation omitted).

To determine whether an impairment is a substantial
limitation on major life activities, the Supreme Court has
looked to EEOC regulations, which consider the following:
"[t]he nature and severity of the impairment; [t]he
duration or expected duration of the impairment; and [t]he
permanent or long-term impact, or the expected permanent or
long-term impact of or resulting from the impairment."
<u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u>, 534 U.S.

184, 196 (2002) (citation omitted).[13]  A claim of medical

disability must be supported by medical evidence.  A

plaintiff cannot rely on "conjecture or surmise."  Heilweil

v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994)

(citation omitted) (affirming summary judgment on

Rehabilitation Act claim).[14]

The definitions of "disability" under the NYSHRL and

NYCHRL are broader than under the ADA and do not require a

demonstration that an impairment substantially limits a

major life activity.  Giordano v. City of New York, 274

F.3d 740, 753 (2d Cir. 2001).  Under the NYSHRL, a

"disability" is

> (a) a physical, mental or medical impairment resulting
> from anatomical, physiological, genetic or

---

[13] The Second Circuit gives EEOC regulations "great
deference" in interpreting the ADA.  Reeves, 140 F.3d at
150 n.3 (citation omitted).

[14] While no agency has issued regulations defining the term
"disabled" under the ADA, the Department of Health,
Education, and Welfare issued regulations interpreting
"physical impairment" under the Rehabilitation Act for the
purposes of establishing when discrimination against
individuals with disabilities receiving federal financial
assistance had occurred.  Toyota, 534 U.S. at 193-94.  In
Toyota, the Supreme Court used those definitions to
construe the definition of "physical impairment" under the
ADA.  Id. at 194-96.  In Bragdon v. Abbott, the Supreme
Court noted that "[t]he ADA's definition of disability is
drawn almost verbatim from the definition of 'handicapped
individual' included in the Rehabilitation Act of 1973, and
the definition of 'handicap' contained in the Fair Housing
Amendments Act of 1988."  524 U.S. 624, 631 (1998)
(citation omitted).

neurological conditions which prevents the exercise of
a normal bodily function or is demonstrable by
medically accepted clinical or laboratory diagnostic
techniques or (b) a record of such an impairment or
(c) a condition regarded by others as such an
impairment.

N.Y. Exec. L. §292(21) (McKinney 2007). See Reeves, 140

F.3d at 155. According to the NYCHRL, "the term

'disability' means any physical, medical, mental or

psychological impairment, or a history or record of such

impairment." N.Y.C. Admin. Code §8-102. While it does not

include having a "condition regarded as ... an impairment"

in its definition of "disability," the NYCHRL elsewhere

bars discrimination based on either an "actual or perceived

disability." Id. at §8-107.

An individual is "regarded as having" an impairment

under the ADA when: "(1) a covered entity mistakenly

believes that a person has a physical impairment that

substantially limits one or more major life activities, or

(2) a covered entity mistakenly believes that an actual,

nonlimiting impairment substantially limits one or more

major life activities." Sutton v. United Air Lines, Inc.,

527 U.S. 471, 489 (1999). In Reeves, the Second Circuit

held that

[T]he mere fact that an employer is aware of an
employee's impairment is insufficient to demonstrate
either that the employer regarded the employee as
disabled or that that perception caused the adverse

> employment action. Plaintiff must show that
> defendants perceived his impairment as substantially
> limiting the exercise of a major life activity.

Reeves, 140 F.3d at 153. Under New York state and local

law, plaintiffs also must show that an employer perceives

the employee as falling under the respective state or local

definition of "impairment." See, e.g., Ashker v.

International Business Machines Corp., 563 N.Y.S.2d 572,

574 (3d Dep't 1990) ("nondisabled individuals ... whom an

employer wrongly perceives as impaired" are protected

against discrimination).


Physical Impairment

Okoro has not offered sufficient evidence to raise a

question of fact that he was disabled due to narcolepsy

while employed at the Ritz. He has offered no admissible

evidence from any physician that he ever suffered from that

condition, and concedes in his Rule 56.1 Statement that he

has never been diagnosed with narcolepsy. Indeed, his

personal physician judged him to be in good health just

months before he applied to the Ritz for employment.

Given this record, Okoro's assertions in his affidavit

that he has had narcolepsy since 2001 and that he

repeatedly lost consciousness while working at the Marquis

do not create a question of fact for the jury as to whether
he suffered from narcolepsy while employed at the Ritz in
2004.  As noted, the assertion is unsupported by any
medical evidence and he does not even contend that this
condition affected his work at the Ritz.


"Regarded as Suffering from an Impairment"

    Okoro also fails to raise a triable issue of fact that
the Ritz regarded him as disabled.  Although Okoro asserts
cryptically that he explained his "medical condition" to
Croce when he applied to the Ritz for a job, it is
undisputed that Croce nonetheless told him to complete his
application and he was hired.  As already described,
knowledge of a medical condition is, by itself,
insufficient to demonstrate that an employer regards an
employee as disabled.  Reeves, 140 F.3d at 153.

    Okoro introduces no other admissible evidence that he
was regarded by any employee of the Ritz as disabled, and
therefore fails to support a prima facie case of disability
discrimination under the ADA, the NYSHRL, or the NYCHRL.
For example, he identifies no difficulty performing his job
at the Ritz which might have led a supervisor to suspect
that he had an ailment.  Neither does he point to any
conversation with a supervisor or a fellow employee at the

Ritz in which he complained of an ailment or requested an accommodation for an ailment.  Nor does he identify any statement by a Ritz employee which could be interpreted as a judgment that Okoro was suffering from a disability.

Okoro suggests in opposition to this motion that Mariano considered him to be disabled.  Okoro has presented no admissible evidence to support that assertion.  While the 2006 opinion by the arbitrator refers to Mariano's testimony that, during the time Okoro worked at the Marquis, Mariano suspected that Okoro may have narcolepsy based on his observation that Okoro was in a deep, trance-like state on one occasion, that opinion is inadmissible hearsay.[15]

---

[15] The Ritz also argues that Okoro's claims should be dismissed because he knowingly and voluntarily signed the settlement agreement, which released all claims against the Ritz.  In response, Okoro asserts that the release is a forgery.  He also contests whether he signed the release knowingly and voluntarily since he was unrepresented by either the union or counsel at the meeting at which he is alleged to have signed the release.  Finally, Okoro argues that his continued efforts to pursue arbitration of his claim against the Ritz demonstrate that he could not knowingly have signed a release of his claims.

The Second Circuit assesses the validity of release using "totality of the circumstances" standard to decide whether a release of claims is knowing and voluntary. Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438 (2d Cir. 1998).  Okoro has created an issue of fact that prevents summary judgment on the basis of the release.

## CONCLUSION

The Ritz's December 19, 2007 motion for summary

judgment is granted. The Clerk of Court shall enter

judgment for the defendant and close the case.

SO ORDERED.

Dated:    New York, New York
          September 30, 2008

                                    _____
                                         DENISE COTE
                              United States District Judge